**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Derrick JACKSON, Defendant–Appellee.**

No. 97–4285.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1997.

Decided Dec. 19, 1997.

---

**ARGUED:** Clarke Francis Ahlers, Columbia, MD, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Jamie M. Bennett, Assistant United States Attorney, Baltimore, MD, for Appellant.

Before NIEMEYER and HAMILTON, Circuit Judges, and BOYLE, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

Reversed and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge HAMILTON and Chief Judge BOYLE joined.

## OPINION

NIEMEYER, Circuit Judge:

Following Derrick Jackson's indictment for drug and gun violations, the district court granted Jackson's motion to suppress critical evidence seized from his residence and automobile. The evidence was seized pursuant to a search warrant obtained on the basis of drug paraphernalia observed in "plain view" in a basement area of the house where Jackson slept. The district court found that the observing officer had consent to be in the basement only to search for a fugitive and that during that search he observed the paraphernalia briefly but did not then recognize it as incriminating. When the officer left the area where he initially had observed the paraphernalia in order to complete his search for the fugitive, the court held that the officer was not authorized to return to the paraphernalia to inspect it more closely. The court concluded that when the officer returned to the area—no longer to search for the fugitive but to observe the paraphernalia—he was no longer "properly in the bedroom, and most certainly not properly in the corner near the cart area, when he made any further observations." Reasoning from that finding, the court suppressed the evidence. On appeal, the government contends that the officer's brief departure from the bedroom area to secure the remainder of the basement did not preclude him from returning to the area to make the observation that revealed the contraband.

Because we agree with the government's position, we reverse the district court's suppression order and remand this case for further proceedings.

### I

In his effort to find federal fugitive Tyrone Barfield, Deputy United States Marshal Richard Henry traced telephone calls to 902 Marlau Street, Baltimore, Maryland. After conducting a brief surveillance of the loca-

tion, Deputy Henry and another officer knocked on the front door, and Sandra Jackson opened it. After Deputy Henry showed Barfield's photograph to Ms. Jackson and explained that he had a warrant for Barfield's arrest, Ms. Jackson informed the officer that Barfield was a friend of her brother. She did not think, however, that Barfield was in the house. Deputy Henry then asked Ms. Jackson, "Can we look around to see because we received a phone call from this house?" Ms. Jackson replied, "Yes." The officers then entered the house. Deputy Henry went downstairs to search the basement, while the other officer went upstairs.

The basement of 902 Marlau was divided into two areas, a front area and a back area. The stairs from the first floor went down into the front area of the basement, and a laundry area was in the back. As Deputy Henry went down the stairs, he observed a bed and some furniture at the foot of the stairs to his left. In the corner, a sheet loosely covered an object. Because Barfield was known to be only "four foot nine," Deputy Henry said that he "challenged that sheet" and, when he got no response, pulled it off the object. As he did so, a bag fell from a wheeled cart onto the floor, spilling some of its contents which included suspicious metal items. Deputy Henry recognized one of them as a strainer but looked no further at the items at that time. Instead, he continued to secure the basement, proceeding to the back area where he encountered a handyman named Rick who was working on the back door. Deputy Henry ordered Rick to gather his tools and go upstairs. After securing the basement, Deputy Henry "came back and looked at the objects [that had fallen from the bag] and it was a number of objects, a scale, sifter and things of that nature." The other things of "that nature" included ziplock bags, numerous gelatin capsules, some white powder, and Isotol, an agent used to cut drugs. Although Henry was not in drug enforcement, he immediately recognized the objects as drug paraphernalia. In making his observations, Deputy Henry testified that he did not touch or move the fallen bag or its contents.

Even though the fallen bag, its spilled contents, and the wheeled cart were in the corner of the front area of the basement, Deputy Henry stated that if he had not returned to them, he nevertheless would have had to "walk by them" to return to the stairs, and that even from the stairs he would have been able to see the spilled objects "in plain view." He acknowledged, however, that after securing the basement he decided to take a second, closer look at the suspicious objects. After observing the drug paraphernalia, Deputy Henry returned upstairs to advise Ms. Jackson of what he had found. Ms. Jackson then identified her brother, Derrick Jackson, as the person who slept in the basement. Because Deputy Henry was not in drug enforcement, he called the Baltimore City Police to report his findings.

Less than thirty minutes later, Baltimore City Police Officer John Cromwell and additional members of the Baltimore City Police Northern District Drug Enforcement Unit arrived. Officer Cromwell searched the contents of the fallen paper bag, finding scales, substantial quantities of packaging material, "thousands" of gel caps, sifters and spoons with white powder residue, packages of cutting agent, and a check-cashing card in Derrick Jackson's name. He summoned a drug-sniffing dog which "alerted" positive for drugs in a locked compartment on the cart from which the bag had fallen. He also ran a background check on Derrick Jackson, which indicated that Jackson had been arrested numerous times on drugs and weapons charges.

While the officers were still at the Marlau Street address, Derrick Jackson drove up in a Chevrolet Blazer truck and began to walk into the house. After Jackson confirmed his identity, the officers handcuffed him and read him his *Miranda* rights. Upon being confronted with the evidence discovered in the basement, Jackson stated, "I don't want to do this in front of my family," at which time he took a few steps to the kitchen and told the officers, "my family got nothing to do with myself and the basement" and "my family got nothing to do with my stuff in the basement."

Based on these facts, Officer Cromwell secured a search warrant to search both the house at 902 Marlau Street and the Chevro-

let Blazer truck. From their execution of the search warrant, the officers recovered a 9mm semi-automatic pistol, ammunition, and substantial quantities of marijuana, heroin, and cocaine. From the truck, they recovered a pager and some gel caps containing what was suspected to be heroin.

After the grand jury indicted Derrick Jackson, he filed a motion to suppress the evidence, and the district court granted the motion, entering an order suppressing all evidence seized on March 3, 1997 from 902 Marlau Street and the Chevrolet Blazer and all statements that Derrick Jackson made. The district court found that Deputy Henry had exceeded his consent when he returned to the sleeping area in the front area of the basement and re-observed the contents of the fallen bag. The court explained that "[a]fter finishing the consensual search of the bedroom, Henry returned to the bedroom to further examine the objects that had fallen when the bag was dislodged. Henry did not seek, and did not have, consent to return to the bedroom for that purpose." The court held that the "only properly obtained evidence was the fact that there was a bag in the bedroom that contained some metal objects, one of which was a strainer." The court also held that this evidence did not support probable cause that a crime had been committed. The court concluded therefore that Deputy Henry and Officer Cromwell did not properly obtain the evidence seized and used as a basis to obtain the search warrant.

The court also found that the officers could not, under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984), rely in good faith upon the warrant because Officer Cromwell's warrant affidavit listed all of the contents of the bag and not simply those items that had fallen out and were *first* observed by Deputy Henry. The court noted that the affidavit supporting the search warrant should have presented "only evidence that Henry saw several metal objects, one of which was a strainer, fall from a bag in a bedroom," and that that evidence would have been manifestly inadequate to lead a judicial officer to find probable cause and issue the search warrant. Concluding that the misrep-

resentation by Officer Cromwell was "both reckless and essential to a determination of probable cause," the court concluded under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that the "warrant must therefore be set aside and the evidence at issue suppressed."

The government filed its notice of appeal from the entry of the suppression order under 18 U.S.C. § 3731.

## II

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that the constitutional protection against an unreasonable search is distinct from the protection against an unreasonable seizure. "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2305, 110 L.Ed.2d 112 (1990).

The "plain-view" doctrine provides an exception to the warrant requirement for the *seizure* of property, but it does not provide an exception for a search. Viewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment:

> It is important to distinguish "plain view," as used in *Coolidge [v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ] to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search, the former generally does implicate the Amendment's limitations upon seizures of personal property.

*Horton*, 496 U.S. at 133 n. 5, 110 S.Ct. at 2306 n. 5 (citations omitted). Not everything in plain view, however, may be seized—only those items that are perceived to be contraband, stolen property, or incriminating in character. *See id.* at 136, 110 S.Ct. at 2307; *Texas v. Brown*, 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983). Further-

more, underlying the plain-view exception to the prohibition against warrantless seizures of property are the requirements that the officer be lawfully present at the location from which the property could be plainly viewed and that he have lawful access to the property. *Horton,* 496 U.S. at 137, 110 S.Ct. at 2307. Thus, when an officer's presence in a residence is justified by a warrant or by any recognized exception to the warrant requirement, including consent, he may seize incriminating evidence that is in his plain view.

■ In summary, the plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent. *See Horton,* 496 U.S. at 136–37, 110 S.Ct. at 2307–08; *United States v. Williams,* 41 F.3d 192, 196 (4th Cir.1994). We review a district court's application of the plain-view doctrine *de novo. Williams* 41 F.3d at 196.

We turn now to apply these principles to the circumstances of this case.

### III

■ The district court's finding that Sandra Jackson provided Deputy Henry with consent to search the house at 902 Marlau Street for Tyrone Barfield is well supported by the record. Thus, when Deputy Henry removed the sheet from the wheeled cart in the basement area during that search, his conduct was within the scope of Ms. Jackson's consent. Derrick Jackson argues, however, that once Deputy Henry left the cart area to secure the remainder of the basement, he was not authorized by that consent to return to the cart area to take a closer look, and that his return without consent violated Jackson's Fourth Amendment privacy rights. Jackson argues that even though the "Government suggests that 'a few steps' shouldn't make any difference ... the 'few steps' constitutes a second warrantless search."

The evidence that Deputy Henry observed in plain view on his return to the wheeled cart area of the basement readily appeared incriminating in character. Without the need for any further inspection or movement of objects, Deputy Henry saw ziplock bags, gel caps, white powder, a strainer, scales, and Isotol, a substance that is used to cut drugs. He immediately recognized these objects as drug paraphernalia. He also was able to connect Jackson to the paraphernalia. Sandra Jackson told Deputy Henry that it was her brother, Derrick Jackson, who lived in the basement, and Jackson himself confirmed this on his return to the house: "My family got nothing to do with *my stuff* in the basement." (Emphasis added). Thus, if Deputy Henry was lawfully present in the basement area from which he plainly observed this drug paraphernalia, the plain-view doctrine would authorize seizure of those items. Moreover, no one disputes that those items would be sufficient, even apart from the other evidence that the officers possessed, to support the lawful issuance of a search warrant. Thus, the question presented is whether Deputy Henry was lawfully in the basement and lawfully walked the few steps to the corner to view a second time what originally had provoked his suspicion.

Sandra Jackson provided Deputy Henry with consent to "look around" the house at 902 Marlau Street in order to search for Barfield. From this, it reasonably follows that Henry was lawfully in the basement area and lawfully removed the sheet from the cart which dislodged the paper bag and part of its contents. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973) ("a search authorized by consent is wholly valid"). The lawful dislodgment of the paper bag placed drug paraphernalia in plain view. Although Deputy Henry did not at first appreciate the significance of this paraphernalia, he considered it sufficiently suspicious to prompt his return to that area of the basement. Deputy Henry's concerns for his safety and for the whereabouts of Barfield, however, briefly interrupted any closer observation. But after he satisfied these concerns, he returned to the spilled bag and, without touching or moving any object, he observed the spilled items,

immediately recognizing them as incriminating. The few steps taken away from the path that Deputy Henry would otherwise have been required to take to return to the stairs caused neither Sandra Jackson nor Derrick Jackson any intrusion of privacy materially beyond that to which Sandra Jackson had already consented. She already had agreed to let Deputy Henry into the house, to let him search every area, and to let him open or uncover areas where Barfield may have been hiding. The detour to make the observation at issue here involved only a few steps and a few seconds. We cannot conclude that such a minor detour was, in the circumstances, an unreasonable intrusion. In so concluding, we note that the test to apply is not a rigid analysis of the language of consent but an examination of the scope of intrusion authorized by that consent.

A search compromising the individual's interest in privacy must be unreasonable to implicate the Fourth Amendment. *See Horton*, 496 U.S. at 133–34, 110 S.Ct. at 2305–06. Indeed, "the touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, —— U.S. ——, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991)). We can find no decision that finds unreasonable, and therefore unconstitutional, such a minor detour, especially where the detour was within an area where the officer was authorized to be, and where the officer was attempting to obtain a better look at evidence in plain view. Indeed, the law is to the contrary.

Only recently, we held that a police officer who was authorized to be at the front door of a house did not implicate or violate the Fourth Amendment when he walked three steps down the porch in order to look through a front window of the defendant's house and observed incriminating evidence. *See United States v. Taylor*, 90 F.3d 903, 908–09 (4th Cir.1996); *see also United States v. Hersh*, 464 F.2d 228, 230 (9th Cir.1972) (per curiam) (holding that observations by law enforcement officers lawfully on porch and at front door was not a search within the meaning of the Fourth Amendment when they looked in an adjacent window and saw what was in plain sight).

Similarly, the Supreme Court has recognized, in somewhat analogous circumstances, that an officer's enhancing his position or ability to see objects otherwise in plain view is irrelevant to any Fourth Amendment analysis. In *Texas v. Brown*, a police officer stopped the defendant Brown for a routine traffic check. During the stop, the officer shined a flashlight into Brown's automobile, observing Brown drop a small balloon and pull his right hand from his pants pocket. When Brown opened the glove compartment to retrieve his license and registration, the officer shifted his position in order to shine the flashlight into the glove compartment to obtain a better view, and he noticed that the compartment contained several small plastic vials, quantities of loose white powder, and an open bag of party balloons. In holding that the officer violated no rights secured by the Fourth Amendment, the Court stated that the fact that the officer " 'changed [his] position' and 'bent down at an angle so [he] could see what was inside' Brown's car, was irrelevant to Fourth Amendment analysis." 460 U.S. at 740, 103 S.Ct. at 1542 (bracketing in original; citation omitted).

Likewise, in this case we hold that Deputy Henry's shift in position by a few steps for a few seconds to observe better what was in plain view did not meaningfully intrude on any privacy interest beyond the intrusion which had been authorized by Sandra Jackson's consent. When this observation confirmed Deputy Henry's suspicion that he was viewing incriminating evidence, he was authorized, under the plain-view doctrine, to seize all of the objects without obtaining a warrant. *See Horton*, 496 U.S. at 134, 110 S.Ct. at 2306; *Brown*, 460 U.S. at 737–39, 103 S.Ct. at 1540–41.

Once we determine that Deputy Henry was authorized to seize the spilled paper bag and its contents, the basis for the district court's vacating the warrant and suppressing the evidence no longer exists. The district court concluded that "the affidavit[supporting the search warrant application] misled the judge [who issued the warrant] by presenting the evidence as if it all had been

properly obtained. Absent from the affidavit was the fact that virtually all of the evidence presented had been obtained improperly." The court concluded, moreover, that the affiant's statements were made recklessly and that "[s]horn of the improperly obtained evidence and drafted so as to avoid misleading the judge, the affidavit would have presented only evidence that Henry saw several metal objects, one of which was a strainer, fall from a bag in a bedroom." Because we conclude to the contrary that the bag and all its contents *were* properly seized without the need of a warrant, it was properly used as a basis for obtaining the search warrant.

For the foregoing reasons, we reverse the district court's order granting the defendant's motion to suppress and remand this case to the district court for further proceedings.

*REVERSED AND REMANDED.*