United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 20, 1997 Decided January 20, 1998 

 No. 97-3073

 United States of America, 

 Appellee

 v.

 Angelo Valentino Garces, a/k/a Lolo, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cr00269-01)

 Jonathan Zucker, appointed by the court, argued the cause 
and filed the briefs for appellant.

 Pamela S. Satterfield, Assistant U.S. Attorney, argued the 
cause for appellee. With her on the brief were Mary Lou 
Leary, U.S. Attorney, John R. Fisher, Thomas C. Black, and 
Brenda Baldwin-White, Assistant U.S. Attorneys.


 Before: Wald, Williams and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Concurring opinion filed by Circuit Judge Randolph.

 Williams, Circuit Judge: Angelo Valentino Garces was 
convicted of violating 18 U.S.C. s 922(g)(1), which makes it a 
crime for a convicted felon to possess a gun and ammunition. 
In this appeal he challenges the admission of a car key and 
related testimony. Officers found the key in a pair of pants 
during a search of Garces's residence pursuant to a lawful 
warrant and used it to open a green and white Cadillac 
parked outside the residence and owned by Garces's aunt. In 
the car, which they searched with the aunt's express written 
consent, they found the gun and ammunition giving rise to the 
charge. At trial the government offered the key (among 
other things) to link Garces to the contraband.

 The key was not among the items described in the warrant. 
And its seizure did not fall within the "plain view" exception 
to the Fourth Amendment's warrant requirement, says 
Garces, because the officers lacked probable cause to think it 
evidence of a crime until after they had searched the car. 
Thus, he says, seizure of the key was illegal.

 Because the only reasonable reading of the aunt's consent 
to search the car is that it included consent to use the key, we 
affirm.

 * * *

 On July 24, 1996 officers of the FBI and Washington 
Metropolitan Police Department went to Garces's house with 
a warrant for his arrest for the murder of Thomas Johnson, 
and a warrant for search of the premises. The warrant 
permitted them to search for and seize various items that 
they had probable cause to believe were evidence or instru-
mentalities of the murder:

 an auto-loading pistol and ammunition, a black mask, a 
 dark colored rain slicker and documentation (mail, tele-
 phone bills, news clippings) demonstrating connections 


 between Mr. Garces and decedent, Johnson, which is [sic] 
 evidence of the crime of murder.

The police entered Garces's home and found him sleeping on 
the couch. Though he initially gave a false name, Garces 
identified himself when confronted by an officer who knew 
him; the officers arrested him and removed him from the 
premises. The police then conducted the search. Two offi-
cers, FBI Agent Bamel and another, went to the basement, 
where they found a pair of camouflage pants neatly folded on 
a chair. They searched the pockets of the pants and found an 
identity card belonging to Garces and a key on a nylon key 
chain, together with a photo of a young girl who turned out to 
be Garces's daughter. The photograph of the key in the 
record gives it the appearance of a car key, apparently to a 
General Motors car though not necessarily a Cadillac. Agent 
Bamel took the key and key chain and went upstairs and gave 
them to the "seizing officer," Agent Bedford, who in turn 
gave the key to Agent Buckley. Meanwhile, upstairs the 
police found a green camouflage rain coat and a black mask in 
the coat pocket, which they seized.

 During the search the officers noticed a green 1970 Cadillac 
with a white roof parked outside. (Tr. 1/6/97, p. 35.) The 
officers phoned to find out who owned the car, and found it 
registered in the name of a Sophia Garces, shown in the 
registration as living at the same residence. Sophia Garces, 
appellant's aunt, was in fact on hand. Agent Buckley asked 
for her consent to search the car. She gave express written 
consent to a search, and also told the officers that Angelo 
Garces, known to her as Lolo, sometimes drove the car. (Tr. 
1/6/97, pp. 64-66.) The validity of Sophia Garces's consent is 
not challenged here.

 Agent Buckley turned the key over to Detective Rivera to 
use in searching the car. Rivera opened the car and in the 
glove compartment found some papers with Garces's name on 
them, and several cellular phones; more to the point, he 
noticed a .45 caliber Colt semi-automatic pistol under the 
front passenger seat. Rivera attempted to look in the trunk 
but could not, since it was locked and could not be opened 
even with the key from the pants. He left the items in the 


car and then asked Sophia Garces whether there was another 
key or set of keys for the car, to which she responded no. 
(Tr. 3/12/97, p. 143.) The police then decided to have the car 
towed to an FBI lot until they could get a warrant to search 
it. When the warrant for the car was executed, the FBI 
seized the gun from under the seat and various documents 
from the glove compartment, some of which had Garces's 
prints.

 At the suppression hearing Garces focused on a claim that 
the car search was illegal. But nested within that contention 
was a claim that the seizure of the key itself was illegal; that 
illegality supposedly invalidated the aunt's consent to the car 
search. (Tr. 3/7/97, pp. 21-23.) As to the key, he argued 
first that it fell outside the scope of the search warrant, and 
furthermore that it was outside the "plain view" exception to 
the warrant requirement because its incriminating nature was 
not "immediately apparent." Coolidge v. New Hampshire, 
403 U.S. 443, 466 (1971). See also Arizona v. Hicks, 480 U.S. 
321, 326 (1987) (specifying that under the plain view doctrine 
the officers must have probable cause to believe that the item 
is incriminating). Here he no longer claims that illegalities in 
the key's seizure undermined the aunt's consent, only that the 
seizure of the key itself, and thus its later admission, were 
invalid.

 The government also focused on the car search during the 
suppression hearing. In response to Garces's claims about 
the key, the government appeared to assert that the key's 
incriminating nature was "immediately apparent," but the 
government never clearly explained why this was so. It 
referred to evidence that the officers knew Garces used the 
Cadillac when he made an illegal threat to potential wit-
nesses. In fact, though, the only knowledge of Garces's car 
use shown by the testimony at the suppression hearing was 
knowledge (acquired by the officers from Sophia Garces) that 
he drove it, so far as appeared, for innocent purposes. The 
judge ruled from the bench that the officers' use of the key in 


searching the car was reasonable, given the link between 
Garces and the car. "[I]f there had been no key they could in 
due course have obtained one, and it also appears that they 
could have opened the car without a key, or they could have 
called a locksmith to make one. The consent not the key was 
the key to the solution." (Tr. 3/7/97, p. 25.) Implicitly, the 
judge seems also to have regarded as reasonable the seizure 
of the key and its introduction as evidence, for the same 
reason.

 At trial the key acquired a greater significance than the 
passing attention given to it in the suppression hearing might 
have suggested. During its deliberations the jury sent back 
to the judge a query asking whether "if someone has ... sole 
control of the only key of the car, does that person have 
constructive possession of everything in the car?" (Tr. 
3/14/97 (a.m.), p. 2.) With both counsels' consent, the judge 
declined to answer; the jury convicted.

 

 * * *

 The first question is whether the key can in fact be deemed 
"seized" during the time between its discovery in the base-
ment and the gun-revealing search of the Cadillac.1 Here we 
divide the process into two periods: the carrying of the key 
from the basement up to the "seizing officer," and then its use 
outside the house to open the car. The first was not a 
seizure. In Arizona v. Hicks, where officers who had entered 
an apartment because of exigent circumstances moved a 
stereo set enough to be able to read its serial numbers, the 
Court found no seizure (beyond that covered by their exigent 
circumstances entry), on the ground that merely moving the 
equipment around enough to spot the serial numbers did not 

__________
 1 The search of the pants pockets was plainly legitimate, since 
items named in the search warrant, ammunition and documents, 
could easily have fitted inside the pants pockets. See, e.g., United 
States v. Jenkins, 901 F.2d 1075, 1082 (11th Cir. 1990); United 
States v. Martinez-Zayas, 857 F.2d 122, 133 (3d Cir. 1988).


subject the defendant's "possessory interest" to any "mean-
ingful interference" beyond that occasioned by the warranted 
search itself, 480 U.S. at 324-25. See also United States v. 
Jacobsen, 466 U.S. 109, 113 (1984); Soldal v. Cook County, 
506 U.S. 56, 61 (1992).2 Similarly, in United States v. Menon, 
24 F.3d 550, 560-61 (3d Cir. 1994), the court found no seizure 
in a searching officer's carrying a document from where he 
found it to a more knowledgeable officer in the next room, 
because moving the document did not meaningfully interfere 
with the defendant's possessory interest in it any more than if 
the more knowledgeable officer had been brought to the 
document.

 Although Garces's brief framed his argument about the 
movement of the key as a case of unlawful seizure, at oral 
argument he seemed to pursue the theory that it was a new 
search. He invoked Hicks's finding that the officers' move-
ment of the stereo equipment initiated a new search because 
it exposed serial numbers not otherwise accessible, and thus 
"produce[d] a new invasion of respondent's privacy unjustified 
by the exigent circumstances." 480 U.S. at 325. But Menon 
rejected an attempt by the defendant to extend Hicks, similar 
to what Garces may be claiming here. Menon argued that 
the more knowledgeable officer's review of the documents 
constituted a new search because his more complete under-
standing of the case's background enabled him to spot incrim-
inating aspects of the papers imperceptible to the first officer. 
The Third Circuit denied the defendant's claim, relying on the 
concept of collective knowledge: in determining whether offi-
cers have probable cause to believe an item qualifies as 
evidence, the court must look to the aggregate knowledge of 
the searching officers. More pragmatically, the court rea-
soned that a contrary ruling would just force law officers to 

__________
 2 Actually, the Court in Hicks said only that "the mere recording 
of the serial numbers did not constitute a seizure," 480 U.S. at 324, 
which leaves open the possibility that the separate moving of the 
equipment, which constituted a search, also constituted a seizure. 
But Justice Powell's dissent, id. at 332, confirms a reading of the 
majority's opinion that the movement of the equipment was a 
Fourth Amendment search but not a seizure.


have the most informed officer do all the searching. 24 F.3d 
at 561-63. We agree. Thus, assuming any variation in the 
scope of the various officers' knowledge, we find neither 
search nor seizure in their carrying the key about the house 
to determine its evidentiary value.

 As for the use of the key outside the house to open the 
Cadillac, we find it unnecessary to address whether this 
action represented a seizure. A warrantless seizure may be 
validated by the consent of someone with authority over the 
property, United States v. Matlock, 415 U.S. 164, 170-71 
(1974), and, as we explain below, Sophia Garces supplied that 
consent.

 Sophia Garces not only gave consent to the search of her 
car, but at the same time said that Angelo drove it. From 
Ms. Garces's statements that she owned the car driven by 
Angelo, the officers could reasonably have inferred: (1) that 
as the car's owner, Sophia Garces was the owner of a key 
which the police had found in Angelo's pants and which they 
reasonably thought would fit her car; (2) that as the car's and 
key's owner, Ms. Garces was legally capable of authorizing 
the police to use the key to search the car; and (3) that her 
consent to search the car in fact exercised that authority. 
Since Ms. Garces was the sole registered owner of the car, it 
was a fair inference that she would be the owner of any keys 
that opened it. One can, of course, imagine scenarios under 
which she might have given her nephew more than mere 
possession, e.g., some "estate for years" in the key (which 
simply means an estate for a fixed period of time), see 
Restatement (First) of Property s 19 cmt. a (1936), but in 
judging what is reasonable officers can expect property rela-
tionships to be the normal or customary ones, not the unusual 
or outr, at least until they are presented with contrary 
information. See United States v. Jenkins, 92 F.3d 430, 437 
(6th Cir. 1996). On the natural assumption that Sophia 
Garces was simply allowing Angelo the use of her car, she 


would normally have the power to revoke her consent to his 
possession of the key. We may assume, without deciding, 
that she could not herself have lawfully burrowed into his 
trouser pockets in order to effect a transfer of possession to 
the officers. But no such burrowing was necessary; the 
officers had already lawfully secured possession of the key.

 Finally, a reasonable reading of Sophia Garces's grant of 
consent was that she implicitly exercised her power to autho-
rize use of the key to facilitate the search. Common sense 
strongly supports that inference. While the officers could 
have effected the car search by jimmying the lock or securing 
the aid of a locksmith, that course offered her no advantage. 
It would have carried some risk of injury to the car, and it 
would have extended the period in which her own access to 
the car was suspended. Thus, although we assume that 
Garces had a sufficient possessory interest in the key to 
entitle him to raise the Fourth Amendment issue, see Soldal, 
506 U.S. at 61-62, the seizure (if any) was reasonable because 
authorized by a party with apparently superior title.

 Although Sophia Garces's consent legitimated the use of 
the key to open the car, there is, of course, no reason to 
suppose that it legitimated the officers' carrying away of the 
key after the car search. (We assume arguendo that the 
carrying away at that time played a causal role in the key's 
availability for use at trial.) We conclude, however, that the 
carrying away was lawful because, once the key was used to 
open the car, its incriminating nature was "immediately ap-
parent." Coolidge, 403 U.S. at 466.

 If the plain view doctrine's immediate apparency require-
ment were taken literally, it would mean that unless search-
ing officers had probable cause to grasp the incriminating 
character of an item not specifically covered by a search 
warrant at the precise moment they first spotted it, its seizure 
would become unlawful for the duration of the search, regard-


less of information lawfully acquired later in the search. 
Such an approach would condition the lawfulness of a seizure 
on the fortuity of whether the item was discovered early or 
late in the search: if officers entered premises under a 
warrant, and first saw a kitchen knife and then a corpse with 
its throat slit, they could not take the knife; but they could if 
the sequence were reversed. Thus, although the phrase 
"immediately apparent" sounds temporal, its true meaning 
must be that the incriminating nature of the item must have 
become apparent, in the course of the search, without the 
benefit of information from any unlawful search or seizure.3

 Cases interpreting the immediate apparency requirement 
of the plain-view doctrine are few and mixed. Menon, dis-
cussed earlier, clearly takes the view that in assessing compli-
ance with the "immediately apparent" criterion, post-
discovery steps needed to establish the papers' incriminating 
character "count" so long as they themselves are legitimate. 
24 F.3d at 560-63. The First Circuit has described the onset 
of probable cause in the plain-view context as a cumulative 
process, using the metaphor of a light bulb: "The sum total of 
the searchers' knowledge must be sufficient to turn on the 
bulb; if the light does not shine during the currency of the 
search, there is no 'immediate awareness' of the incriminating 
nature of the object." United States v. Rutkowski, 877 F.2d 
139, 142 (1st Cir. 1989) (emphasis added). And just last 
month the Fourth Circuit held that the plain-view doctrine 
validated a seizure of drug paraphernalia, despite the fact 
that the searching officer did not recognize the incriminating 
nature of the paraphernalia until he had left the room and 

__________
 3 Such unlawful search might, of course, include search of the 
object itself. See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) 
("If ... the police lack probable cause to believe that an object in 
plain view is contraband without conducting some further search of 
the object ... the plain-view doctrine cannot justify its seizure."). 
But any subsequent legitimate steps in the search process are as 
effective as prior steps in supplying the requisite knowledge.


returned to view it a second time. United States v. Jackson, 
1997 WL 780240 at *1, *4 (4th Cir., Dec. 19, 1997).

 On the other hand, the Sixth Circuit has enunciated the 
doctrine that the officers must have probable cause to believe 
the item incriminating "at the time of discovery." See, e.g., 
United States v. Szymkowiak, 727 F.2d 95, 98 (6th Cir. 1984); 
United States v. Beal, 810 F.2d 574, 577 (6th Cir. 1987). The 
latter case, however, is quite reconcilable with our view. 
Officers discovered fountain pens that they suspected were in 
truth guns and seized them; only later, after disassembly and 
lab analysis, did they raise their knowledge from mere suspi-
cion over the probable cause threshold. Id. at 576. Szym-
kowiak explains that the purpose of the temporal immediacy 
rule is to "obviate prolonged, warrantless rummaging." 727 
F.2d at 98. But as long as any "rummaging" must be lawful 
for its yield to qualify (as under our view), it is unclear how 
the Szymkowiak rule provides any additional deterrence to 
prevent officers from unlawful invasions of privacy or posses-
sory interests. Just as searching officers "are not limited by 
the fortuity of which officer first happened upon the evi-
dence," Menon, 24 F.3d at 561-62, we believe they should not 
be limited by the fortuity of which piece of evidence they 
happen upon first.

 Our reasoning here may differ in detail from that of the 
trial court and from the theories pressed by the government, 
and we are mindful of the resulting risk of prejudice to the 
defendant, see United States v. Dawkins, 17 F.3d 399, 408 
(D.C. Cir. 1994) (citing Giordenello v. United States, 357 U.S. 
480, 488 (1958)). But, as we observed before, at the suppres-
sion hearing the defendant did not focus attention on the 
admissibility of the key. The lawfulness of the seizure of the 
key was indeed at issue, but mainly as part of the challenge to 
the car search. Thus the district court's aphoristic disposi-
tion of the issue ("The consent not the key was the key to the 
solution") was a completely understandable telescoping of 
issues presented by the defendant. If defendant had been 
troubled by the ambiguity as to whether the finding of 
consent encompassed use of the key, the burden was on him 


to demand clarification. United States v. Mitchell, 951 F.2d 
1291, 1299 (D.C. Cir. 1991); United States v. Caballero, 936 
F.2d 1292, 1296 (D.C. Cir. 1991).

 

 * * *

 Garces raises two evidentiary points. He moved in limine 
to exclude evidence of threats made by him with a gun that 
looked like the weapon found in the Cadillac. The court ruled 
that the victims of these threats could testify to seeing Garces 
six days before the seizure and could describe the weapon he 
had in hand, but that they could not speak of the threats. At 
trial things did not work out exactly as intended. The threat 
victims blurted out the threats, saying that Garces had said 
he was "going to shoot" them. (Tr. 3/10/97, pp. 78, 149.)

 While Rule 404(b) of the Federal Rules of Evidence 
generally excludes evidence of "other crimes, wrongs, or 
acts ... to prove the character of a person in order to show 
action in conformity therewith," it permits such evidence for 
such purposes as proving "motive, opportunity, intent, prepa-
ration, plan, knowledge, identity, or absence of mistake or 
accident." Appellant does not appear to claim here, however, 
that the threat testimony was inadmissible under Rule 404(b), 
but only that in admitting it the trial court abused its 
discretion under Rule 403, because of its unduly prejudicial 
effects. The "emotionally compelling" nature of the "death 
threats" testimony was by itself enough to overwhelm deliber-
ative consideration of the "abstract," colorless charge of con-
structive possession of a firearm.

 The judge was clearly aware of the potentially prejudicial 
nature of the witnesses' references to the threats, and indeed 
ruled them out. They were not directly elicited by the 
prosecutor's questions, and there is no indication in the 
record that the prosecutor encouraged the lapse. Indeed, 
one of the blurtings occurred in response to a question by 
defense counsel on cross-examination. (Tr. 3/10/97, p. 113.) 
The judge took reasonable precautions to minimize the risk of 
any misuse, instructing the jury that the threat incident 


testimony was admitted only "for the limited purpose of 
aiding you to decide whether the defendant possessed the gun 
recovered by the police...." (Tr. 3/13/97, p. 64.) He went 
on to caution them that they may not consider the testimony 
about the threats "as evidence that the defendant had a bad 
character or that the defendant has a criminal personality." 
Id. Accordingly, we find no abuse of discretion in letting the 
jury, properly instructed, proceed to judgment. Further-
more, any possible prejudice from the references to the 
threats was well within the threshold of harmless error, given 
the overwhelming strength of the case against Garces.

 Garces also sought protection from being linked to the 
Thomas Johnson murder for which the arrest warrant was 
issued. The court ruled that the government could introduce 
evidence of the warrant, execution of which had led to seizure 
of the car and its contraband, as part of the explanatory 
background, but said that the government witnesses must not 
refer to the warrant's being for the crime of murder. At 
trial, though the murder charge was not specifically men-
tioned, some witnesses referred to "homicide" investigators. 
Garces argues that even the reference to the arrest warrant 
was a violation of Rule 404(b), on the theory that the search 
warrant alone adequately explained the officers' appearance 
at Garces's house, while the homicide references improperly 
linked him to a murder investigation.

 Although the search warrant would have explained the 
officers' presence in Garces's home on July 24, it would not 
have explained what happened on their finding him there--
his arrest. Yet that was part of the story explaining the links 
among Garces, the key and the car. So we reject Garces's 
404(b) argument. That the investigators' homicide specialty 
came out produced some but by no means all of the taint that 
would flow from mention of arrest for murder; jurors would 
reasonably suppose that homicide investigators must some-
times arrest for lesser crimes. Thus we find no abuse of the 


court's discretion under Rule 403 to balance probative value 
against prejudicial effect.

 The judgment of conviction is

 Affirmed.



 Randolph, Circuit Judge, concurring: It should have been 
simple enough to explain why the officers' seizure of the car 
key complied with the Fourth Amendment. Sophia Garces' 
consent to the search of her car carried with it her consent to 
using the key to open the car door. See Florida v. Jimeno, 
500 U.S. 248, 250 (1991). The officers had already lawfully 
discovered the key in the defendant's clothing during the 
search authorized by the warrant. When the officers opened 
the car with the key, they found a gun. Upon completing 
their search of the car, they relocked the door, had the car 
towed to an FBI lot, and seized the key.

 It does not take any intricate analysis to conclude that in 
addition to towing the car away, the officers could take the 
key as well. They could lawfully seize both items for the 
same reason: the car and the key were plainly evidence of 
defendant's criminal activity. Warden v. Hayden, 387 U.S. 
294, 307 (1967), is directly on point. As the Court put it in 
Soldal v. Cook County, 506 U.S. 56, 65-66 (1992), a plain view 
seizure is valid so long as the probable cause standard is 
met--it was here--and so long as the seizure is "unaccompa-
nied by unlawful trespass"--which it was in view of Sophia 
Garces' consent to the search. Other decisions sustaining 
seizures of the sort we have in this case are cited in 3 Wayne 
R. LaFave, Search and Seizure s 8.1(c), at 623-24 (3d ed. 
1996).

 The majority gets itself into an unnecessary tangle by 
supposing that the validity of the seizure of the key rests on 
"the consent of someone with authority over the property. 
United States v. Matlock, 415 U.S. 164, 170-71 (1974)." Maj. 
op. at 7. In the first place, Matlock dealt only with the 
validity of a search not a seizure. In the second place, the 
legality of the seizure of the key (or the car for that matter) 
rested on the principles explained in Soldal, not on Sophia 
Garces' consent. Her permission enabled the officers to look 
for evidence of criminal activity without getting a warrant, 
but once they discovered such evidence, they did not need her 
consent to seize it.


 One other point is worth mentioning. I entirely agree that 
the officers had not seized the key within the meaning of the 
Fourth Amendment during their search of the premises, even 
though they had removed it from its original location. It is 
true that the Supreme Court has defined a Fourth Amend-
ment seizure as a "meaningful interference" with an individu-
al's possessory interests. E.g., United States v. Jacobsen, 466 
U.S. 109, 113 (1984). But I do not believe the Court meant 
this test to apply while a lawful search is ongoing. Whenever 
federal officers conduct a search of premises pursuant to a 
warrant, there is "a meaningful interference with" everyone's 
"possessory interests" in everything in the line of the search. 
Those present must stand aside. Until the search has ended, 
they cannot grab things, proclaim "these are mine," and walk 
away with the objects. If they tried anything of the sort, 
they could be prosecuted. See 18 U.S.C. s 2231. The 
"meaningful interference" test should be applied only after 
the search has ended and the officers have taken property 
away or have "secured" the premises from entry. This of 
course means that the key was not seized until after the 
officers used it to open the car door, at which point its 
evidentiary value was plain.