**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 21-4085**

―――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICKY D. RUNNER,

Defendant - Appellant.

―――――――――

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:19-cr-00024-JPB-JPM-1)

―――――――――

Argued:  May 5, 2022                                    Decided:  August 8, 2022

―――――――――

Before WILKINSON and AGEE, Circuit Judges, and FLOYD, Senior Circuit Judge.

―――――――――

Affirmed by published opinion.   Senior Judge Floyd wrote the opinion in which Judge Wilkinson and Judge Agee joined.

―――――――――

**ARGUED:**  Robert G. McCoid, MCCOID LAW OFFICES, P.L.L.C., Wheeling, West Virginia, for Appellant.  Lynette Danae DeMasi-Lemon, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.  **ON BRIEF:**  Randolph J. Bernard, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

―――――――――

FLOYD, Senior Circuit Judge:

Appellant Ricky Runner pleaded guilty to one charge of being a felon in unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), but reserved his right to appeal the district court's denial of his motion to suppress evidence seized during a warrantless search of his vehicle after officers visually observed a glass stem pipe in the console of his car.  Runner now makes that appeal, arguing the stem pipe was insufficient to trigger the plain view exception to the Fourth Amendment's protection from unreasonable searches.  Finding neither clear factual error nor an error of law in the district court's reasoning, we affirm.

I.

A.

On October 11, 2018, in Moundsville, West Virginia, city police officer Zachary Mucheck responded to an anonymous tip received at approximately 1:45 a.m.  The tipster reported that a woman was "shooting up," J.A. 21, in a "blue Volkswagen with Ohio tags" parked in a Wal-Mart parking lot, J.A. 29.  Upon arrival, Officer Mucheck observed a woman exiting the passenger's side of a blue Volkswagen with Ohio tags in what he described as a "pretty empty" parking lot.  J.A. 22.  He stopped and confronted her, notifying her of the received tip.  The woman, identified as Stacy Garloch, adamantly denied having injected narcotics.  She was not evasive and answered Mucheck's questions in a straightforward and logical manner.  She exhibited no symptoms of impairment, i.e., slurred speech, disorientation, or difficulty standing.  Garloch offered to show Mucheck

2

her arms. He observed no fresh track marks.

Shortly after Mucheck initiated this encounter, Officer Robert Shilling, a trained drug recognition expert, arrived on the scene. He conducted his own investigation of Garloch's arms, identifying scars from prior intravenous drug use but noting no evidence of fresh use. Garloch explained that she had been applying makeup in the car, and Mucheck noted that Garloch was indeed wearing makeup. She reiterated that she no longer used drugs and offered to allow the officers to check her feet for signs of recent injection as well. She granted the officers' request to search her purse. They found no contraband.

Mucheck conducted an initial visual inspection of the interior of the car through its windows. He spotted several make-up bags in the passenger side door but nothing suggesting illegal activity. Although Mucheck acknowledged that the information provided by the anonymous caller was not fully corroborated in so much as the officers did not find evidence of someone "shooting up," he nevertheless asked for permission to search the vehicle. J.A. 31–35. Garloch declined the request, stating that since it was not her vehicle, she did not believe that she had authority to consent to the search. She advised the officers that the driver, Ricky Runner, was in the store.

The officers conferred, and Mucheck proposed that they "might as well wait for homeboy to come out [of Wal-Mart] and try to get consent." J.A. Clip 1 at 0:07:15. Before Runner had emerged from the store, however, Shilling conducted his own visual inspection of the vehicle's interior and identified a glass stem pipe in the center console of the vehicle. According to Shilling's testimony, he believed the pipe had a "frosted tint" to it, indicating prior use. J.A. 70. But he could not discern with certainty, from his inspection outside the

3

vehicle, whether the pipe had ever been used or, if used, what substance had been used in it.

After obtaining a physical description of Runner from Garloch, Mucheck entered Wal-Mart. As he entered, he disabled his body camera, as he claimed, to conserve the battery. According to Mucheck's testimony, once he identified Runner, he insisted Runner come outside with him. Runner did not exhibit any signs of impairment. Mucheck acknowledged that, at that point, Runner was not free to leave and that his Fourth Amendment rights were triggered. By the time Runner and Mucheck exited the store, more law enforcement officers had arrived.

Shilling asked Runner for permission to search the vehicle, but Runner declined. Mucheck and Shilling then advised Runner that they did not need his permission to search because the pipe furnished them with probable cause. Thus advised, Runner unlocked the car. The resulting search of the car's interior, which began at 2:14 a.m., yielded marijuana, as well as suspected crystal methamphetamine and Xanax pills in Garloch's make-up bag. Neither Runner nor Garloch had active, valid driver's licenses.

During a safety pat-down, Mucheck asked Runner if there were any firearms in the car. Runner indicated he did not know but acknowledged it was possible because his cousin, the owner of the vehicle, owned firearms. He also advised officers that he was a convicted felon and could not "be around" any firearms. J.A. 25. Searching the trunk, officers found ammunition, a magazine with ammunition, and a Hi-Point .40 caliber firearm, as well as additional crystal methamphetamine and a needle. Garloch and Runner were both arrested.

4

B.

On June 4, 2019, a grand jury returned a one-count indictment against Runner, charging him with being a felon in unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On August 20, 2020, Runner filed a motion to suppress the evidence seized during the vehicle search, arguing that the officers lacked probable cause for the plain view search because the incriminating character of the stem pipe was not immediately apparent. A magistrate judge held an evidentiary hearing on September 11, 2020, during which Mucheck and Shilling testified, recounting their investigation and rationale for the search. Mucheck identified the pipe as drug paraphernalia and stated that the search of the vehicle was entirely predicated on the presence of the pipe. Shilling also characterized the pipe as drug paraphernalia used to "either smoke like crystal meth, crack cocaine, stuff like that." J.A. 66. Both officers were questioned about their knowledge regarding the use of pipes to smoke legal hemp and cannabidiol (CBD) oil. Mucheck noted that pipes are used to smoke both legal hemp and illegal narcotics. Shilling agreed that individuals smoke legal hemp but stated he was not aware of anyone doing so in a stem pipe.

Also during the hearing, William Schmitt—the owner of a shop selling CBD products, pipes, and other related items—testified as a witness for Runner. Schmitt identified himself as an activist in the area of promoting the use of legal hemp and CBD products as an effective means to treat pain and other health issues. He testified that the use of CBD products has expanded rapidly, recently becoming "quite a big thing." J.A.

5

81. Although he acknowledged that the most traditional way to ingest CBD oil is by oral drops, he stated that stem pipes, which his store sells, are used by some to smoke hemp and CBD oils.

The government filed supplemental briefing on September 17, 2020, to more fully address the issue of whether drug paraphernalia is sufficient for probable cause. On September 18, 2020, Runner filed supplemental briefing to argue that glass pipes no longer signal unlawful contraband because of their expanded commercial use for smoking hemp or CBD oil.

On September 28, 2020, the magistrate judge issued his report and recommendation (R&R), advising that the motion to suppress be denied. The judge found, given the circumstances surrounding the search and Shilling's specialized drug detection training, that it was reasonable for the officers to "believe that the pipe in the console of Defendant's vehicle was used to smoke illegal substances, and therefore, the criminal nature of the pipe was immediately apparent." *United States v. Runner*, No. 5:19CR24, 2020 WL 7093403, at *8 (N.D.W. Va. Sept. 28, 2020), *adopted*, No. 5:19-CR-24, 2020 WL 6285206 (N.D.W. Va. Oct. 27, 2020). The magistrate judge believed that the officers' conclusions were not vitiated "simply because pipes of this nature can and apparently have been used more recently to smoke legal substances . . . ." *Id.* at *9. Runner filed objections to the magistrate judge's R&R on October 13, 2020.

On October 27, 2020, the district court entered its opinion and order adopting the R&R, overruling Runner's objections, and denying the motion to suppress. The district court upheld the plain view search because "both officers were lawfully in a place from

which the glass pipe was plainly viewed." *Runner*, 2020 WL 6285206, at *2. It further held that the officers had probable cause to believe the glass pipe constituted contraband or evidence of a crime because it was "immediately apparent" the stem pipe could facilitate "criminal activity." *Id.*

Following the district court's denial of his motion to suppress, Runner entered into a plea agreement on November 2, 2020, reserving his right to appeal the denial of his motion to suppress. On February 24, 2021, Runner was sentenced to 51 months' incarceration and 3 years' supervised release. This timely appeal of the denied motion to suppress followed.

II.

When examining the denial of a motion to suppress, this Court "reviews the district court's legal determinations de novo and its factual conclusions for clear error." *United States v. Shrader*, 675 F.3d 300, 306 (4th Cir. 2012) (citation omitted). In conducting this review, the Court evaluates the evidence "in the light most favorable to the government." *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010) (citations omitted).

The Fourth Amendment's protection against unreasonable searches is not implicated when the plain view doctrine applies. This Court has held that "[v]iewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment . . . ." *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997). However, "[n]ot everything in plain view . . . may be seized—only those items that are perceived to be contraband, stolen

7

property, or incriminating in character." *Id.*

So for the plain view exception to apply, the government must show that: "(1) the officer [was] lawfully in a place from which the object [could] be plainly viewed; (2) the officer ha[d] a lawful right of access to the object itself; and (3) the object's incriminating character [wa]s immediately apparent." *Id.* at 1109 (citations omitted). There is no question that the first two prongs are satisfied, and they are not contested by Runner. So the sole question in this case is whether the incriminating character of the visible glass stem pipe was immediately apparent to Shilling.

The Supreme Court has indicated that "the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Texas v. Brown*, 460 U.S. 730, 741 (1983). Relevant case law has elsewhere articulated that a search conducted under the plain view doctrine "is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Id.* at 738 (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)). Probable cause is a "flexible, common-sense standard" that "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Id.* at 742 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Runner argues that the presence of a glass pipe, which could be drug paraphernalia, in plain view *alone* and without more, does not give rise to a finding of probable cause.

8

This court has not addressed that question. And this case does not directly present it. Here, officers were called to the scene by an anonymous tip reporting intravenous drug use. One of those officers believed, based on his experience and training as a drug recognition expert, that the glass pipe in question was contraband. On its face, that evaluation meets the admittedly low standard: that the facts available warrant that items *may be* contraband or stolen property. *See Brown*, 460 U.S. at 742.

Resting on the notion that the pipe alone justified the search, Runner points to two cases in which the Sixth Circuit defined "immediately apparent," arguing the intrinsic nature of the pipe did not provide probable cause because the pipe could be used to smoke legal hemp and CBD oil. *See United States v. Beal*, 810 F.2d 574, 576–77 (6th Cir. 1987); *United States v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002). But those cases differ on their facts, in that the evidence in question consisted of objects the courts determined to be intrinsically innocent.

In *Beal*, the government unsuccessfully appealed the district court's order granting the defendant's suppression motion. 810 F.2d at 575. Searching the defendant's room pursuant to a warrant for stolen furniture, officers came across two items that appeared to be fountain pens, which the officers noted were "suspicious" because they were "extremely heavy." *Id.* at 575–76. The pens were seized and later determined to be able to expel .22 caliber projectiles. *Id.* at 576. The defendant was charged with possession of an unregistered firearm. *Id.* Affirming the district court, the Sixth Circuit reiterated factors that help determine whether the incriminating nature of an object is immediately apparent, including the "intrinsic nature" or "appearance" of the seized object. *Id.* at 576–77

9

(citations omitted).  The court concluded that the pens were "intrinsically innocent" objects that could not immediately have been perceived as incriminating.  *Id.* at 577.

In *McLevain*, the Sixth Circuit reversed the district court's denial of the defendant's motion to suppress evidence of a twist tie, cigarette filter, spoon with residue, and unlabeled prescription bottle that were found in various locations, purportedly in plain view, during a search of the defendant's residence.  310 F.3d at 441–43.  The Sixth Circuit recognized that it was the officers' experiences as law enforcement agents that led them to believe that these everyday objects were drug paraphernalia but held that "[t]he connection between these items and illegal activities . . . is not enough to render these items intrinsically incriminating" or "to make their intrinsic nature such that their mere appearance gives rise to an association with criminal activity."  *Id.* at 442.

The items that the Sixth Circuit found did not provide a basis for probable cause in *Beal* and *McLevain* were everyday objects that *could be* put to illegal ends.  A stem pipe is not such an object.  Rather, as confirmed by Shilling's experience as a drug recognition expert, the *predominate* purpose of stem pipes has been—and continues to be—to smoke illegal substances.  Despite the increased use of glass pipes to ingest legal substances such as CBD oil, it is still reasonable that a police officer would reach the belief that a glass pipe was evidence of a crime supporting probable cause.

It is important to reiterate that cases from this Circuit upholding plain view searches based on pipes and paraphernalia have involved the presence of additional evidence or indicators that contributed to a finding of probable cause.  *See, e.g.*, *United States v. Jones*, 667 F.3d 477, 480, 485 (4th Cir. 2012) (plain view observations of precursors to the

10

manufacture of methamphetamine, coupled with the strong odor of chemicals associated with methamphetamine production a pipe containing marijuana, and a pill crushed into powder); *United States v. Bullard*, 645 F.3d 237, 241, 243–45 (4th Cir. 2011) (plain view of both cocaine residue and paraphernalia coupled with odor of narcotics); *Jackson*, 131 F.3d at 1107, 1109 (plain view of scale, sifter, plastic bags, numerous gelatin capsules, some white powder, and Isotol, an agent used to cut drugs); *United States v. Turner*, 933 F.2d 240, 244 (4th Cir. 1991) (cocaine along with drug paraphernalia in plain view between the seats of the defendant's vehicle); *United States v. Halvorsen*, No. 88-5805, 1988 WL 60907, at *1 (4th Cir. June 6, 1988) (observation of a pipe coupled with information from a local police officer that he had observed the defendant smoking and had detected the odor of burnt marijuana); *United States v. Chulengarian*, 538 F.2d 553, 554–55 (4th Cir. 1976) (plain view of pipe alongside two bags of marijuana and a marijuana cigarette).[*]

This case similarly involves something more than a mere pipe. A pipe alone would not necessarily trigger the plain view exception. However, this case still presents a close question. In this instance, the officers were responding to an anonymous tip. Admittedly, that tip reported a method of ingesting illegal drugs different from intake via a pipe. Neither Garloch nor Runner appeared under the influence, and Garloch had no new track marks on her arms. Shilling could not tell *immediately* whether the glass pipe had been

---

[*] For an out-of-circuit case addressing similar facts, see *United States v. Van Zee*, 380 F.3d 342, 343–44 (8th Cir. 2004), in which the Eighth Circuit declined to suppress a law enforcement officer's search of a vehicle after the officer observed erratic driving, and then upon the stop, viewed one to one-and-one half inches of glass tubing, presumed to be a stem pipe, through an open car door, because the officer had past "experience as a narcotics investigator" and previously "had been told about [the subject's] drug activities."

11

used or, if so, what had been smoked in it.  Nevertheless, the anonymous tip that initiated the officers' investigation was corroborated to the extent that they found a woman exiting a "blue Volkswagen with Ohio tags," J.A. 29, in an otherwise "pretty empty" Wal-Mart parking lot, J.A. 22.

That initial corroboration of the anonymous tip, alongside Shilling's drug recognition expertise, is sufficient.  "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).  And the Supreme Court has noted that "innocent behavior frequently will provide the basis for a showing of probable cause," pushing back against lower courts attempting to "impose a drastically more rigorous definition of probable cause" or "a too rigid classification of the types of conduct that may be relied upon in seeking to demonstrate probable cause." *Id.*

Thus, even though a glass stem pipe may be put to innocent uses—uses that continue to expand and should be taken into consideration—here, viewing the evidence in the light most favorable to the government and in its totality, the plain view exception applies, and the search of the vehicle was lawful.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

12